1

2

3

4

5

6

7                          UNITED STATES DISTRICT COURT
                          WESTERN DISTRICT OF WASHINGTON
8                                     AT SEATTLE

9

10   WALTER DEMAREE,

11                    Plaintiff,

                                              CASE NO. C05-1849JLR
12          v.
                                              ORDER
13   BABCOCK & BROWN HOLDINGS, INC.,
14   et al.,

15                    Defendants.

16

17                              **I.  INTRODUCTION**

18          This matter comes before the court on a motion for summary judgment from

19   Defendants Babcock & Brown Holdings, Inc. and Babcock & Brown Associates, LLC

20   (collectively, "Babcock & Brown") (Dkt. # 48).  The court has considered the papers filed in

21   connection with the motion and finds the matter appropriate for disposition without oral

22   argument.  For the reasons stated below, the court DENIES Babcock & Brown's motion.

23

24

25

26   ORDER – 1

## II. BACKGROUND[1]

Babcock & Brown is a global investment and advisory firm.  Plaintiff Walter Demaree worked for Babcock & Brown for nearly seventeen years, during which time he invested heavily in the company.  According to Mr. Demaree, Babcock & Brown "departnered" him in October 2003, and reduced his percentage of company holdings.  Demaree Decl. (Dkt. # 56) ¶ 3.  At the time, Mr. Demaree asked Chief Executive Officer Jim Babcock to consider him in the event that the company underwent a restructuring.  Id.  Mr. Demaree attests that he received assurances from Mr. Babcock that the company would "take care" of him.  Id. Dissatisfied with his "departnered" status, Mr. Demaree ultimately decided to resign, effective December 2003.  Id.  His departure triggered redemption of his equity interests in Babcock & Brown, calculated at an adjusted book value ("ABV") for a total of $5,869,727 (before interest).

Around the time of Mr. Demaree's resignation, Babcock & Brown terminated five other shareholders: Steven Cohn, Sue Sparks, Linda Byberg, Dennis Moritz, and Will Robinson (collectively, the "Former Shareholders").  As in Mr. Demaree's case, the company redeemed the Former Shareholders' equity interests in the company at the ABV.  Jaworski Decl. (Dkt. # 52) ¶ 10.

In June 2004, Mr. Demaree negotiated a separation agreement with Babcock & Brown. Compl., Ex. A ("Agreement").  At this point in time, Mr. Demaree knew that the company had plans to go public.  Demaree Decl. ¶ 5.  Concerned that Babcock & Brown was "cutting [him] out of the opportunity to realize the gains from [his] long-term investment in the company," Mr. Demaree again requested assurances from Mr. Babcock that he would have a

---

[1]The parties' briefs provide a careful and thorough discussion of the background leading to the current dispute.  The court appreciates this context, but discusses only those facts, taken in the light most favorable to the non-moving party, necessary to resolve the instant motion.

ORDER – 2

future with the company.  Id.  This time, Mr. Demaree contends, his request went unheeded.

Id.  In any event, Mr. Demaree negotiated a "most favored nations" provision in his

separation agreement in an attempt to ensure that, at the very least, he would receive the same

treatment as other shareholder-employees leaving the company.  Id. at ¶ 6.  The provision

provides:

> We represent and warrant to you that the per share/unit consideration received by you for your Stock, your [Babcock & Brown] Units and your Phantom Units . . . will be at least as much as that paid to any other Stockholder/Unitholder whose Stock, [Babcock & Brown] Units or Phantom Units were redeemed during the fourth quarter of 2003 or the first quarter of 2004.  In the event that, for any reason, we make any additional payment to any Stockholder or Unitholder whose Stock, [Babcock & Brown] Units or Phantom Units were redeemed by us in the fourth quarter of 2003 or the first quarter of 2004, with respect to their Stock, [Babcock & Brown] Units or Phantom Units, we agree to promptly inform you of such fact and to pay to you an amount sufficient to ensure that the total consideration received by you, calculated on a per share or per Unit basis, is at least as much as the total consideration received by such other Stockholder or Unitholder on a per share or per Unit basis.

Agreement at ¶ 7.

Like Mr. Demaree, the Former Shareholders had concerns that, based on the timing of

their forced departure, they would lose out on any investment gains resulting from a

restructuring event.  For example, Mr. Cohn, wrote an email to Mr. Babcock in which he

explains:

> [T]he consequence of this [termination] is that my long-term investment in the company is being redeemed at termination value and I have to give up on any residual that may be realized.  That is not right . . . .  Bottom line, my severance does not compensate me for my lost upside.

Chyz Decl. (Dkt. # 57), Ex. B.  Ms. Byberg made a similar plea, just days prior to the

company's Initial Public Offering ("IPO"): "I'm sure you will do what is fair and pay me my

share of the upside which is considerable."  Id. at Ex. D.

ORDER – 3

1    As predicted, Babcock & Brown had a successful IPO in October 2004.  Major

2    shareholders enjoyed significant gains, while departed employees like Mr. Demaree and the

3    Former Shareholders realized nothing.  Shortly thereafter, the company offered "thank you,"

4    or bonus, payments in the amount of $75,000 to some of the Former Shareholders - Mr.

5    Cohn, Ms. Byberg, and Ms. Sparks.  Ms. Sparks and Mr. Cohn complained that the

6    remuneration was paltry in comparison to what they would have earned had they stayed with

7    Babcock & Brown through the IPO.  Id. at Exs. Q, R.  In particular, Ms. Sparks highlighted

8    the fact that she "lost out on the difference between a mere accounting construct (ABV) and

9    the true value of the stock, as reflected in its actual market value (set at the IPO)."  Id. at Ex.

10   R.  She urged Babcock & Brown to consider how she could recapture some of the "foregone

11   market value" of her equity interest in the company.  Id.  In turn, Babcock & Brown increased

12   the offer to $100,000.

13        In January 2005, Mr. Cohn, Ms. Byberg, and Ms. Sparks signed and returned waiver

14   letters, accepting $100,000 bonus payments from the company.  Hall Decl. (Dkt. # 51), Exs.

15   K-M.  Nevertheless, Mr. Cohn continued to express his dissatisfaction with the amount.  He

16   wrote an email to Babcock & Brown's Human Resources Manager Ruthann Cambra that

17   summarized the history behind the bonus payment, and again cited the differential between

18   the paid-out ABV value and the IPO value: "we bitched and moaned and reminded the

19   company that [the $75,000 concession] is about 3 cents on the dollar vs. what our compatriots

20   own in Babcock & Brown stock but to little avail."  Chyz Decl. at Ex. Y.  Ms. Cambra

21   replied to Mr. Cohn's email, relaying the status of his request under the heading "B&B

22   Stock."  Id. at Ex. Y.  Subsequent to Mr. Cohn's request, Mr. Babcock obtained approval

23   from the Babcock & Brown board for an additional AUS $1[2] million pool of funds for

24   _____

25        [2]The court uses "AUS $" to represent amounts expressed in Australian currency.

26   ORDER – 4

1   distribution among the Former Shareholders.  Id. at Exs. CC, EE, JJ, KK.  In April 2005, the

2   company distributed the monies to Mr. Cohn, Ms. Byberg, and Ms. Sparks in the amount of

3   AUS$150,000, and to Mr. Moritz and Mr. Robinson in the amount of AUS$500,000 and

4   AUS$50,000, respectively.  At no time did Babcock & Brown mention to Mr. Demaree the

5   January or April 2005 payments made to the Former Shareholders.  Demaree Decl. ¶ 10.

6        In March 2005, and again in September 2005, Mr. Demaree's counsel sent letters to

7   Babcock & Brown to inquire whether the company had made any payments to other

8   shareholders, triggering the most favored nations provision of his separation agreement.  Chyz

9   Decl., Exs. OO, PP.  In response to the first letter, Babcock & Brown's general counsel

10  telephoned Mr. Demaree's attorney and simply stated that it had made its representation to

11  Mr. Demaree in the severance agreement.  Chyz Decl. ¶ 43.  In a letter dated October 3, 2005,

12  Babcock & Brown's general counsel denied that the bonus payments to Former Shareholders

13  triggered the most favored nations provision.  Id. at Ex. QQ.

14       Mr. Demaree filed suit in state court against Babcock & Brown for alleged breach of

15  the separation agreement's most favored nations provision.  The company removed to this

16  court on the basis of diversity jurisdiction.  Babcock & Brown now moves for summary

17  judgment on grounds that the most favored nations provision does not apply as a matter of

18  law because the bonus payments were (a) gratuitous, and (b) not issued as consideration with

19  respect to stock.  Mot. at 1.  Mr. Demaree contends that whether the most favored nations

20  provision applies involves a question of fact that the court cannot resolve at the summary

21  judgment stage.

22                              **III.  DISCUSSION**

23       Summary judgment is appropriate if the evidence, when viewed in the light most

24  favorable to the non-moving party, demonstrates there is no genuine issue of material fact.

25  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Galen v. County of

26  ORDER – 5

<u>Los Angeles</u>, 477 F.3d 652, 658 (9th Cir. 2007).  The moving party bears the initial burden of showing there is no material factual dispute and he or she is entitled to prevail as a matter of law.  <u>Celotex</u>, 477 U.S. at 323.  The moving party can satisfy this burden in two ways: (1) by producing evidence that negates an essential element of the non-moving party's case, or (2) after suitable discovery, by showing that the non-moving party does not have enough evidence of an essential element to carry its burden of persuasion at trial.  <u>Id.</u> at 322-23; <u>see also</u> <u>Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.</u>, 210 F.3d 1099, 1106 (9th Cir. 2000).  If the moving party meets its burden, the opposing party must present evidence to support its claim or defense.  <u>Cline v. Indust. Maint. Eng'g. & Contracting Co.</u>, 200 F.3d 1223, 1229 (9th Cir. 2000).  For purely legal questions, summary judgment is appropriate without deference to the non-moving party.

In Washington,[3] contract interpretation is a question of law when (a) the interpretation does not depend on the use of extrinsic evidence, and (b) the extrinsic evidence does not admit more than one reasonable inference.  <u>Tanner Elec. Coop. v. Puget Sound Power & Light</u>, 911 P.2d 1301, 1310 (Wash. 1996).  These limitations, which arose from the decision in <u>Berg v. Hudesman</u>, 801 P.2d 222 (Wash. 1990), have engendered "much confusion" over a court's role in contract interpretation.  <u>Hearst Comms., Inc. v. Seattle Times Co.</u>, 115 P.3d 262, 266 (Wash. 2005).  In <u>Hearst</u>, the Washington Supreme Court clarified that extrinsic evidence applies only "'to determine the meaning of *specific words and terms used*' and not to 'show an intention independent of the instrument' or to 'vary, contradict, or modify the written word.'"  <u>Id.</u> at 267 (quoting <u>Hollis v. Garwall, Inc.</u>, 974 P.2d 836, 843 (Wash. 1999)) (emphasis in <u>Hearst</u>).  Absent extrinsic evidence pertaining to a specific term, the court must "give words in a contract their ordinary, usual, and popular meaning unless the entirety of the

---

[3]Sitting in diversity, the court applies the substantive law of Washington to the parties' dispute. <u>Ins. Co. N. Am. v. Federal Express Corp.</u>, 189 F.3d 914, 919 (9th Cir. 1999).

ORDER – 6

1   agreement clearly demonstrates a contrary intent."  Id. (directing courts to interpret "what was

2   written" rather than "what was intended to be written").

3           Babcock & Brown argues that the most favored nations provision does not apply as a

4   matter of law because the bonus payments did not constitute "consideration" in exchange for

5   the Former Shareholders' stock.  The court disagrees that the provision applies only when

6   some form of legal consideration changes hands.  The use of the term "consideration" in the

7   first sentence of the provision refers to what Mr. Demaree received from the company.

8   Agreement at ¶ 7 ("We [Babcock & Brown] represent and warrant to you that the per

9   share/unit consideration received by you for your Stock . . . will be at least as much as that

10  paid to any other Stockholder . . . .").  The second sentence employs different and broader

11  terminology to describe a different transaction altogether – i.e., what other shareholders might

12  receive from the company ("any additional payment") and on what condition they might

13  receive it ("for any reason").  Agreement at ¶ 7 ("In the event that, for any reason, we make

14  any additional payment to any Stockholder . . . .).  Where the language is plain on its face, the

15  court declines to borrow a term from one sentence and substitute it for the parties' selection

16  of a different term in another sentence.  Such a re-writing not only ignores basic principles of

17  contract interpretation, but is inconsistent with the parties' use of the expansive phrase "for

18  any reason," to describe the conditions under which the company might make such payments.

19

20          Notably, even if the court accepted Babcock & Brown's proffered construction, the

21  court would conclude that the bonus payments issued to the Former Shareholders constitute

22  consideration, and not gifts.  In exchange for the payments, the Former Shareholders made

23  promises to the company to keep the payments confidential, and agreed to release any future

24  claims against Babcock & Brown.  Hall Decl., Exs. K-M.  Under Washington law, such a

25  bargained-for exchange suffices as consideration.  See State v. Brown, 965 P.2d 1102, 1107

26  ORDER – 7

1    (Wash. 1998) (recognizing that "forbearance to prosecute a valid claim or assert a legal right

2    constitutes sufficient consideration for a contract").

3           Although a somewhat closer question, Babcock & Brown's second basis for awarding

4    summary judgment also fails.  The company contends that because the bonus payments did

5    not amount to "some right associated with stock ownership, such as . . . distributed earnings,

6    dividends, or redemption payments," Reply at 6, they cannot constitute "payment . . . with

7    respect to stock."  In essence, Babcock & Brown urges the court to construe "payment . . .

8    with respect to stock" to mean "payment for stock," or "payment in exchange for stock."  The

9    court declines to import such a limitation into the phrase "with respect to."  On its face, the

10   language "payment . . . with respect to stock" is not confined to a direct redemption of stock

11   or the like; rather, "with respect to" encompasses any payment that bears some relationship to

12   stock.

13          Whether the company made the bonus payments "with respect to" the Former

14   Shareholders' equity interests in the company is a question for the jury.  In opposing Babcock

15   & Brown's motion, Mr. Demaree provides sufficient evidence from which a jury could

16   reasonably conclude that the company issued bonus checks precisely because a select group

17   of shareholders complained about their lost opportunity to realize IPO-related gains – i.e., that

18   the bonus payments related to the employees' stock.  To be sure, a reasonable jury could also

19   conclude that the payments were *not* made with respect to stock, for example, based on

20   evidence that the round-dollar amount of each Former Shareholder's bonus was not in relative

21   proportion to the number of shares held by that employee at the time of termination.  Still,

22   whether the bonus payments bore some relationship to stock is a question for the jury.

23   Accordingly, the court denies summary judgment.

24

25

26   ORDER – 8

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## IV.  CONCLUSION

For the reasons stated above, the court DENIES Babcock & Brown's motion for summary judgment (Dkt. # 48).

Dated this 28th day of August, 2007.


JAMES L. ROBART
United States District Judge

ORDER – 9